WILLIAMS *v*. WALKER.

Opinion delivered March 21, 1921.

1. APPEAL AND ERROR—AMENDMENT OF PLEADINGS TO CONFORM TO EVIDENCE.—Pleadings will not be treated on appeal to conform to an issue raised by the evidence where it is apparent that the issue was not fully developed.

2. PARTNERSHIP—EVIDENCE.—A finding of the existence of a partnership *held* not contrary to the preponderance of the evidence.

3. LIMITATION OF ACTIONS—PARTNERSHIP ACCOUNTING.—The relation between copartners does not create such a trust as will exempt a bill for an accounting and settlement from the operation of the statute of limitations.

4. LIMITATION OF ACTIONS—PARTNERSHIP ACCOUNTING.—The statute of limitations of three years is applicable to an action for an accounting between partners.

5. LIMITATION OF ACTIONS—PARTNERSHIP ACCOUNTING.—A suit for an accounting by one member of a partnership, formed to purchase collateral securities from a pledgee, was not barred where the partnership had not been dissolved, repudiated or settled at the time of filing of the suit.

Appeal from St. Francis Chancery Court; *A. L. Hutchins*, Chancellor; affirmed.

*L. C. Going,* for appellant.

1. The findings of the court are against the clear preponderance of the evidence. The plaintiff's claim was not established as the law requires.

2. The claim is barred by the statute of limitations. 14 Ark. 62.

The three-year statute of limitation is applicable to an action for an accounting between partners. 92 N. Y. S. 904; 102 App. Div. 589; 56 S. W. 418; 10 Ky. Law. Rep. 448; 10 O. C. D. 71; 181 Pac. 437; 14 Ark. 192; 20 R. C. L. 216, § 259. The burden was on the plaintiff to show that his action was not barred. 69 Ark. 311; 64 *Id.* 26; 27 *Id.* 343, 500.

An action is commenced when the complaint is filed and summons issued. 104 Ark. 627. Since no summons was ever issued on the cross-complaint of appellee, no

action was commenced until appellant filed his answer on March 5, 1920.

*J. W. Morrow,* for appellee.

1.   The chancellor found that Walker was correct in his contention, and his finding is not against the clear preponderance of the evidence.   Walker owned a half interest in the funds, as the evidence shows and as the chancellor found.

2.   Walker is not barred by any statute of limitations.   Williams occupied toward Walker a position of trust, and the statute does not run.   The law is so clear that authorities need not be cited.

SMITH, J.   This litigation was begun September 8, 1917, when the First National Bank of Forrest City filed a bill against Eugene Williams and George P. Walker, to foreclose a mortgage.   No defense was made to the suit, but on November 18, 1918, Walker filed a cross-bill against Williams, in which he alleged that he and Williams had entered into a partnership whereby, for a consideration of $7,500, they had purchased from Cook, Gray & Co., of Memphis, Tennessee, certain collaterals of the J. W. Beck Company, of Forrest City, deposited with Cook, Gray & Company to secure an indebtedness of the Beck Company. Williams filed an answer to the cross-complaint on March 5, 1920, in which he denied the existence of a copartnership.   In addition, Williams alleged that the cause of action sued upon was barred by the statute of limitations.

The issues are stated in appellant's brief as follows: "The two questions raised by the pleadings may be concretely stated as follows:

"Did Williams, for the benefit of himself and Walker, as the result of a partnership arrangement, purchase from Cook, Gray & Co., the collateral of the J. W. Beck Company, and did appellee, Walker, own an undivided one-half interest in the profits arising from that partnership?

"Second. If any cause of action has existed in favor of Walker and against Williams on account of said partnership arrangement, has the statute of limitation barred the same?"

These were the issues raised by the pleadings, and, after thus stating them in his brief, appellant also questions the right of Walker to the relief prayed upon the ground that, if he was interested in the purchase of this collateral from Cook, Gray & Company, he concealed that interest from his creditors by taking an assignment of the collateral to Eugene Williams individually, instead of to himeslf and Williams.

But, as has been said, no such issue wa sraised in the pleadings. The deposition of Walker was taken a second time, and it was then that, upon his cross-examination, he stated that he was in financial difficulty and did not want anything in his name. But no attempt was made to develop the extent of his financial difficulty. He may or may not have been insolvent. He was further asked on his cross-examination: "When did your financial condition get better," and he answered, "Since 1916." His solvency appears to have been conceded at the time of the trial. It appeared that he owed the Beck Company a personal indebtedness, and that he had endorsed for that company to Cook, Gray & Company; but it is not shown that he was otherwise indebted.

The creditor who sold the collateral was Cook, Gray & Company, and it must be assumed that company knew of Walker's indebtedness to the Beck Company, and of his liability as an endorser for that company. In fact, Cook, Gray & Company had employed Walker to assist in the collection of the collateral, which was later sold, and it was while thus employed that the offer to sell to him was made, and the offer to sell included his own indebtedness.

We think this testimony is not sufficient to require us to treat the pleadings as being amended to raise

the issue that Walker's purchase was in fraud of his creditors.

The testimony of Williams and Walker is in irreconcilable conflict, and numerous circumstances are pointed out contradicting and corroborating each of them. The testimony may be summarized as follows:

Beck & Company had borrowed money from Cook, Gray & Company, and had hypothecated certain collateral, mostly chattel mortgages, and Walker and other stockholders of the Beck Company had endorsed the paper of the Beck Company. The Beck Company went into bankruptcy, and N. B. Nelson was elected trustee. Immediately upon the adjudication in bankruptcy, Cook, Gray & Company employed Walker to assist them in the collection of the collateral. Cook, Gray & Company advised Walker that they would take $6,000 for the collateral they had, which included an obligation of Walker's, secured by a chattel mortgage, for $4,000, and they would take $7,500 for the collateral and the open accounts of the Beck Company for which there was no security. Included in this last item was an account of Walker's for several thousand dollars.

Up to this point there appears to be no contradiction in the testimony. The parties differ as to what thereafter occurred.

Walker testified that a copartnership between himself and Williams was formed to purchase the collateral and the open accounts. That he gave Williams a mortgage on his home for $5,750, which Williams at once sold to the bank of which he (Williams) was cashier, and that Williams himself advanced $1,750, and with the $7,500 thus raised they bought the collateral and the open accounts. That the Beck Company did a general furnishing business extending over both St. Francis and Cross counties, and much effort, labor and expense were required to realize on the securities the Beck Company had taken. That he (Walker) assumed the duty of realizing on this collateral as a part of the partnership agreement,

and devoted five months of his time thereto. That his duty under the partnership agreement required him to collect up and sell various articles of personal property, and some live stock, and in some cases he took renewal notes. That all collections of money were turned over to Williams, and all renewal notes taken were made payable to Williams' order. That his first note to Williams was dated January 23, 1912, and at Williams' request he executed a new note on April 29, 1914. That the partnership agreement with Williams was that this note should be satisfied out of the collections which he (Walker) was making, and this should have been done, as more than enough money had been collected for that purpose, but Williams explained that he had not been able to collect all the notes which he (Walker) had turned over to him (Williams), and that he (Williams) needed a new note to carry the account properly with the bank, and that no interest had been, or would be, charged on the note. No interest was charged, and the note was renewed and made payable directly to the bank. This is the note secured by the mortgage which this suit was brought to foreclose.

Walker further testified that he did not press the matter of a final settlement, as he knew his own indebtedness to the Beck Company had been paid through his copartnership with Williams, and while he knew he had some additional profits he supposed, when all the collections were finally made by Williams, a final settlement would be had, and that Williams had never told him he was through liquidating the notes which he (Walker) had turned over to him, or that he was prepared to make a final settlement, and it does not appear that all the notes were ever collected.

Williams testified that there was no partnership, and that the purchase from Cook, Gray & Company was for his own benefit, and that he alone advanced the entire consideration for the purchase. That Walker at the time owed the Beck Company something over $9,000, which be permitted Walker to settle by executing the note for $5,750. That he was the cashier of the bank, and opened

a new account at the bank, which was carried in the name of "Eugene Williams—Beck Company Note Fund." That the $7,500 was paid by himself alone. That the last item of the account was collected on October 28, 1913, and the account at the bank was checked out and closed by him on January 1, 1914, and that he never knew Walker claimed an interest in the purchase until the foreclosure suit was brought.

The assistant cashier of the bank, and the man who succeeded Williams as cashier upon his retirement from the bank, testified that he had frequently heard Walker and Williams discussing the various accounts included in the Cook, Gray & Company collateral, but did not know anything about the respective interests of the parties.

Walker was very strongly corroborated by Nelson, the trustee in bankruptcy. The claim of Cook, Gray & Company was filed by Williams and Walker, and Nelson testified that Williams and Walker had discussed the purchase many times in the office of the Beck Company in his presence. That Walker was the active man in the matter, and he had on more than one occasion heard each of them, in the presence of the other, speak of the transaction as a partnership affair.

The testimony shows that the last item collected was not on October 28, 1913, as stated by Williams.

Among the accounts purchased was that of a man named Switzer, whose account was secured by a life insurance policy, which had been assigned to the Beck Company. This policy was for a thousand dollars. Switzer died, and an attorney was paid a fee of $25 for assisting in the collection of the policy, and the balance of $975 was collected July 12, 1916, and was credited on Walker's note to the bank. In his first deposition, when asked why he had given Walker credit for the proceeds of the policy, Williams answered: "Simply because his note was past due at the time, and I was undertaking to help him pay it, and at that time he was not in a position to pay it." Williams' deposition was taken a second time, when he explained that, upon further investigation, he found that

the Switzer note was not included in his purchase, and that he had not bought the insurance policy, and that "the insurance policy either belonged to Walker by virtue of his having bought the book accounts of Beck & Company, or belonged to the First National Bank as collateral against their notes—I don't know which." Nelson testified, however, that the Switzer account and policy was sold and transferred to Williams along with all the other collaterals.

The court found the facts to be that Williams acquired possession of the collateral and accounts by virtue of a partnership agreement, and that he had collected thereon the sum of $12,246, and that the partnership had not been dissolved, repudiated, or settled at the time of the filing of this suit, and entered a decree based upon that finding. The court's direction upon that finding is not questioned; but it is insisted that the finding itself is contrary to the preponderance of the evidence; and that Walker's cause of action was barred by the statute of limitations.

Upon a consideration of all the testimony in the case, we are unable to say that the court's finding is clearly against the preponderance of the testimony. Nor do we agree with counsel for appellant that the cause of action was barred.

In the case of *Adams* v. *Taylor,* 14 Ark. 626, this court held that the relation between copartners does not create such a trust as will exempt a bill for an accounting and settlement from the operation of the statute of limiations. And it is also true that the three years' statute of limitations is applicable to an action for an accounting between partners. But that statute does not begin to run until the cause of action has accrued.

In the case of *Luke* v. *Rhodes,* 117 Ark. 605, which was a suit for an accounting between copartners, we said, in disposing of a plea of laches and of limitations, "Of course, the right to sue for an accounting would continue as long as the partnership continued, and no plea of limitations or laches could be made against such

suit while the partnership continued." And we have here an express finding of fact that "the said partnership had not been dissolved, repudiated, or settled at the time of the filing of this suit." If this be true as a matter of fact, then it necessarily follows as a matter of law that the suit was not barred. See, also, *Lasker-Morris Bank & Trust Co.* v. *Gans,* 132 Ark. 402.

In the case of *Pearce* v. *Mann,* 10 Ky. Law Rep. 448, it was held by the Kentucky Superior Court that "limitation does not begin to run against a claim by one partner against another, growing out of the partnership transaction, until the termination of the partnership. And where a partnership was entered for the purchase of certain notes, the profits to be equally divided, the partnership did not end until the completion of the adventure by the collection of the notes in full."

Decree affirmed.