BOOTH *v.* HAYDE.

5-1371                                            307 S. W. 2d 227

Opinion delivered November 18, 1957.
[Rehearing denied December 23, 1957.]

*Warner, Warner & Ragon,* for appellant.

*O. E. Williams,* for appellee.

CARLETON HARRIS, Chief Justice. Thomas J. Hayde, then a resident of Eureka Springs since December, 1945, on January 15, 1946, obtained from one Roy F. Parkhill a one year option to purchase approximately 360 acres of land in Carroll County, commonly known as Blue Springs Farm. For the option he paid $1,200, which was to apply on the purchase price of $20,000 if the option was exercised. In the spring of 1946, Hayde became acquainted with Frank Sweeney, a real estate broker of Chicago, and the two of them made an agreement with a Mrs. Lyon of Chicago to divide said land and sell it in lots; however, Mrs. Lyon withdrew, and the agreement was cancelled. Hayde authorized Sweeney to advertise lots for sale, though at the time, title could not be conveyed, since neither Hayde nor Sweeney could finance the purchase of the property. Sweeney returned to Chicago and advertised the property in the Chicago Tribune. Mrs. Maude Poston (who later took the name of Evan Booth through marriage), appellant herein, and widow of a dentist who had died in 1944, saw the advertisement and contacted Sweeney. He called on appellant; she advised him that she was interested in purchasing a lot for a home, and he invited her to a party at his office, which was to be attended by numerous other prospective buyers. Sweeney also telephoned Hayde at Eureka Springs, who likewise attended the Chicago party. A large number of people were present, and appeared enthusiastic over the lots. Appellant told Sweeney that she was ready to purchase a lot, and he

then advised her title could not be conveyed because it was required that $10,000 cash be paid to Parkhill before a deed could be executed, and neither he nor Hayde was able to make such a payment. Sweeney then proposed that appellant finance the purchase, and join with them in their project of selling lots. He represented that the lots would be easy to sell, reminded her of the large number of people who had attended the party, stated that she would have nothing to do but execute the deeds, and that he and Hayde would handle everything else. Appellant was quite interested, and she and Sweeney went to Eureka Springs in January, 1947, being met there by Hayde. In the meantime, Hayde had obtained an extension on his option, and on January 23, 1947, Hayde, Sweeney, and appellant entered into the following contract.

"This Contract and Agreement made and entered into by and between Maude E. Poston, and Frank Sweeney, both of Chicago, Illinois, and Thomas J. Hayde of Eureka Springs, Arkansas, WITNESSETH:

It is the purpose of this Contract and the intention of the parties hereto to form a partnership on a basis of 40 per cent to Maude E. Poston and 30 per cent each to Frank Sweeney and Thomas J. Hayde. Thomas J. Hayde has an Option on the Roy Parkhill Blue Springs Farm of approximately 360 acres and is anxious to complete said Option and obtain a deed for said property. The consideration for said property's purchase price is $20,000 and Maude E. Poston is this day paying $10,000 to the said Parkhill on the same and in the execution of Parkhill's deed he is to make it to Maude E. Poston and retain a vendor's lien, which is known by some as a Mortgage for $10,000 due in one year, drawing interest at the rate of 5 per cent per annum, and during this year the same may be paid in payments of at least $500 each on any tracts of land that are sold in five acre or less tracts, at which time C. A. Fuller, as agent and attorney for the said Parkhill, shall release the same from this vendor's lien or mortgage.

The said Frank Sweeney is to obtain his interest by reason of his activity and work of promoting and selling

or causing to be sold various tracts of land out of this big tract, and it is recognized that he shall have complete charge of all sales, commissions and prices, and as the land is sold, all the money received therefor, less commissions and real operating expenses, is to be paid to Maude E. Poston and Roy F. Parkhill, and neither the said Sweeney nor Hayde are to receive any of their interest in said lands until these two obligations of Poston and Parkhill are fully paid.

It is understood that the said Thomas J. Hayde, who is located in Eureka Springs, will show people over the farm and do all within his power to favorably present the project to prospective purchasers and in this same connection, also without compensation, he will fly such people as want to be flown over the place from his flying field located nearby.

This Contract may be terminated upon the request of either party hereto when the purchase price for the land has been paid, together with all expenses thereto and terminated either by a division of the balance of the land left or in cash as may be agreed upon by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have set their hands in triplicate this 23rd day of January, 1947.''

Appellant deposited $1,000 in a Eureka Springs bank in the Blue Springs Development account as an advance. Some improvements were made on the property, mostly at the expense of appellant, but the sale of lots did not materialize. By October, 1947, activity in connection with the sale of lots had ceased. Sweeney apparently abandoned any interest that he had, and the project was at a standstill. According to Hayde's testimony, he talked with appellant in late September or early October in Chicago relative to the project. Appellant stated that Sweeney was ''out,'' and that other arrangements would have to be made; thereafter she went to South America, staying for something over a year. In May, 1948, Hayde went to California and has resided there since, though according to his testimony, Arkansas

is still his official home. Appellant, through her then attorney[1], paid $1,500 on the Parkhill indebtedness, and received an extension of time to pay the balance. Hayde next saw appellant in Eureka Springs in 1949 or 1950[2], at which time she advised him that she was working hard to pay off the mortgage on the place; he testified that he saw her in 1953 at Blue Springs, but she would not talk business with him. Mrs. Booth had made some improvements on the property, and operated it as a tourist attraction, charging admission to see the springs, and selling post cards, candy, and various trinkets. According to her testimony, she spent $23,290 on improvements, and paid the balance due Parkhill by obtaining other loans, some indebtedness still remaining. In September, 1955, Hayde instituted suit against appellant, Frank Sweeney, and Cecil E. Maberry[3], trustee, alleging that he (Hayde) was a partner of appellant, asking that the partnership be dissolved by a decree of the court, and that a master be appointed to take proof and state the account between the parties; that he be given judgment for his interest in said property. Upon hearing, the court held Hayde to be a partner under the contract herein set out, and further held that appellant acquired the title to said land as trustee for said partnership[4]. The court found that Sweeney had abandoned any interest that he had, and that such interest should be vested in Hayde and appellant in equal shares; that appellant held a 55 per cent interest and Hayde a 45 per cent interest, subject to existing liens and indebtedness. A master was appointed to state the account between the parties. From such judgment comes this appeal.

[1] She testified that she borrowed this money from the attorney and he obtained the extension while she was in South America.

[2] Appellant came to Eureka Springs after returning from South America.

[3] Appellant borrowed $14,000 from Maberry in December, 1950, and executed deed to him conveying said land. The deed actually was intended as a mortgage, though Maberry paid the taxes the entire time he held same. The $14,000 and amounts paid for taxes were repaid Maberry within five years, and he reconveyed the property. Maberry, accordingly, is not involved in this litigation.

[4] Appellant had purchased additional land for $200 which the court also held to be partnership property.

For reversal, appellant first argues that no partnership was created, or existed, under the contract. The record is voluminous, and a large part of the testimony taken, and exhibits introduced, were on this question, which is argued rather fully in both briefs. Some of the facts would indicate a partnership; other facts tend to dispute the existence of such a relationship. However, under the view that we take, it is not necessary that this question be determined in order to dispose of the litigation. It is immaterial whether the contract created a partnership or was simply a contract of employment. As previously set out, appellant paid $10,000[5] on the purchase of the Blue Springs property, and the remaining $10,000 was due within one year. This remaining $10,000 was to be paid by the sale of lots, as per the contract:

"* * * and as the land is sold all the money received therefor, less commissions and real operating expenses, is to be paid to Maude E. Poston and Roy F. Parkhill, and neither the said Sweeney nor Hayde are to receive any of their interest in said lands until these two obligations of Poston and Parkhill are fully paid * * *"

Sufficient lots were not sold to pay the indebtedness[6] to Parkhill, much less to repay appellant the advances she had already made. At the end of the year, it was necessary that appellant borrow money to pay Parkhill, in order to protect her previous investment. Otherwise, Parkhill could have foreclosed, and the rights of any or all of the parties under the contract would have ended. Sweeney had told appellant that the lots could be sold within three months. Hayde testified that he told appellant that it might take up to a year. At any rate, it was contemplated and intended by all parties that sufficient lots would be sold within the year to pay both Parkhill and appellant. The contract provided that same could then be terminated by a division of the bal-

---

[5] While not definitely established, the evidence strongly indicates that Hayde received back his $1,200 which he had paid for the option from this amount.

[6] Only one lot was sold actually, and that by appellant.

ance of the land or a division of cash. Since the lots were not sold, the common undertaking "fell through." Under the contract, the parties had nothing to divide until the lots were sold and the indebtedness paid. The conditions imposed in the contract preliminary to Hayde and Sweeney obtaining an interest were never met. Hayde says that appellant is responsible for the failure to sell lots; that numerous prospects were available and the lots could have been sold if water had been distributed to each lot. He testified that he ordered pipe for a water main, but that appellant had her agent cancel the order. Though carefully reading the contract, we are unable to find any provision which requires Evan Booth to pay for a water main, or any other improvement. Improvements are not mentioned. There is no indication that the contract relates to other than a sale of the lots in their then present condition. We are of the opinion that appellant was entirely within her rights in refusing to pay out additional money, and the contention of appellee is not well taken.

It is conceded that the Sweeney interest was abandoned. It likewise appears that Hayde abandoned any interest he might have had. In his testimony, he relates various acts that he performed relative to showing the property to prospects:

"* * * I had to get up at 4 o'clock in the morning, and drive to the railroad station in Monett, meet the prospect, and—with my station wagon—drive them back to Eureka Springs, get them set up or put up at a hotel and call for them later; show them the property physically, with the station wagon; walk over it with them, and sometimes give them a plane ride over the entire property, if the party felt like it. Sometimes they did not want to. And sometimes they were not content with just looking over that property; they wanted to look over the rest of the country and I felt obliged as a matter of courtesy to spend the entire day with them showing them around. I would say on various occasions I did this as often as three times a week. I also was always available for the local realtors any time they called there and wanted to send a prospect out for me to ac-

tually show them the property even if they didn't accompany them. And I would say I showed the actual property to almost every local realtor in the whole vicinity or anybody that wanted to look at it. I continued to show that property to any and everybody that desired to see it up until I left here in the early months of 1948 when I left Eureka Springs. I didn't . . . *until the actual time I left Eureka Springs*[7], I didn't ever abandon the idea of selling it or that we would get together and it would be sold. * * *"

After leaving Eureka Springs and going to California, it appears that he returned a few times for short periods, but the record does not reveal any activities in connection with Blue Springs. Certainly, Hayde was unable to perform his duties under the contract after moving to California. He was no longer in a position to "show people over the farm and do all in his power to favorably present the farm to prospective purchasers," or to fly people over the place. It therefore appears, and we so hold, that he abandoned and repudiated the agreement or contract on May 1, 1948. Hayde contends that appellant was responsible for the failure of the project, and had already violated the agreement by taking the lots off the market[8], and that this left nothing further for him to do. If Hayde took this view, then such action, within itself, should have been notice to appellee that appellant considered their business relationship at an end; there were also other circumstances that should have served to notify appellee that he had best take steps to protect any rights that he might have under the contract. For instance, Hayde testified that he went to Chicago in September or October of 1947, to talk with appellant, and was told at her hotel that she had gone to South America. While he was standing at the desk, she came downstairs to get her mail. "* * * Mrs. Poston was quite embarrassed, and asked me to sit

---

[7] Emphasis supplied.

[8] One Steve Ellis, a real estate broker, wrote two people on September 29, 1947, that the lots were temporarily off the market. He testified that he was acting of his own accord as an independent real estate broker who had had the property for sale, and not at the direction of appellant.

down and have some coffee. She was having her breakfast. \* \* \*'' She told him Sweeney was out of the picture, that they (Hayde and Booth) would just have to make some other arrangement, and that she would come down to Eureka Springs the following week to discuss same with him. She did not show up. Taking this version[9], it certainly should have been obvious to Hayde, from the fact that Mrs. Booth was apparently trying to avoid him, and further, did not come to Eureka Springs as she had promised, that she was repudiating the contract, and had no intention of making any further agreements relative to the project; nor did she make any effort to contact him thereafter, either before or after his move to California.

If a partnership is created without a written instrument, then an action for accounting must be filed within three years after the dissolution. *Williams* v. *Walker,* 148 Ark. 49, 229 S. W. 28. Here, Hayde claims that the written instrument created a partnership agreement, so his action for an accounting was due to be filed within five years. Sec. 37-209, Ark. Stats. Anno. (1947). The same statute would also apply if the instrument is only a contract of employment. Accordingly, in either event, any right which might have been held by Hayde under the contract, as partner, or employee, was barred by both laches and the statute of limitations, since his suit was not instituted until September, 1955.

For the reasons herein set out, the decree of the Chancery Court is reversed, and the cause is remanded with directions that a decree be entered consistent with this opinion.

---

[9] Appellant testified: "\* \* \* I told him I was on my way to South America within a very short time; that I was just about ready to go. And he said, 'Well, what about Blue Springs?' And I said, 'You are through, I will not recognize you any more because you have done nothing. Mr. Sweeney is out and you are, too. That is that.' "